**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| BARBARA HARRISON , by her next friend and guardian, MARGUERITE HARRISON,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>CECILE YOUNG, in her official capacity as THE ACTING EXECUTIVE COMMISSIONER, TEXAS HEALTH AND HUMAN SERVICES COMMISSION<br><br>　　　　　Defendant. | Cause No. 3:18-cv-1730 |

**PLAINTIFF'S ORIGINAL VERIFIED COMPLAINT**

# TABLE OF CONTENTS

INTRODUCTION.................................................................................................1

PARTIES ...........................................................................................................5

JURISDICTION AND VENUE.........................................................................5

BACKGROUND FACTS ...................................................................................6

    I.    Barbara Harrison and Her Medical Condition. ......................................... 6

    II.    The Texas Medicaid Program ................................................................... 7

    III.    HHSC's Decision to Reduce Requested Funding for Services to Barbara in Her Group Home Below That Necessary for Her Survival ........................................... 9

    IV.    Federal and State Law Prohibit Unnecessary Institutionalization .......................... 11

    V.    HHSC's Violation of Barbara's Due Process Rights................................. 13

    VI.    Barbara's Income and Inability to Post Bond ......................................... 15

COUNT I:  VIOLATIONS OF THE ADA AND SECTION 504 ......................15

COUNT II:  VIOLATION OF DUE PROCESS AND 42 U.S.C. § 1983..........16

PRAYER FOR RELIEF....................................................................................17

VERIFICATION

i

Barbara Harrison  ("Barbara"), by her next friend and guardian Marguerite Harrison, complaining of and against Cecile Young in her official capacity as Acting Executive Commissioner of the Texas Health and Human Services Commission ("HHSC"), alleges as follows:

# <u>INTRODUCTION</u>

1.     Marguerite Harrison brings this action on behalf of her forty-two year old medically fragile daughter, Barbara, whom HHSC has deprived of the Home and Community-based Services ("HCS") private duty nursing services necessary to keep her alive due to its constructive denial of Barbara's request for general revenue funds.

2.     Barbara has been medically diagnosed with, among other things, cerebral palsy, epilepsy, obstructive sleep apnea, severe dysphagia, gastrostomy tube dependence, scoliosis, and profound intellectual disability.  Barbara is also non-verbal and non-ambulatory, making it impossible for her to communicate any of her medical needs. Barbara resides at an HCS residential support group home (the "Group Home").

3.     Dr. Terry Hollingsworth, Barbara's primary care physician, has stated unequivocally in correspondence submitted to Defendants and attached to this Complaint as Exhibit A that (1) "Barbara requires LVN presence at all times to ensure that she does not aspirate or choke[;]" (2) "[s]uch aspiration and/or choking could potentially lead to death in minutes or could result in pneumonia which could itself be quickly fatal or could further compromise Barbara's respiratory system[;]" and (3) "moving Barbara from her community home where she currently receives LVN services 24/7 to a nursing home without 24/7 LVN services will expose Barbara to respiratory-related illness, will cause a further decline in her health and will carry an extreme risk of resulting in her death."

1

4.      Plaintiff's other treating physicians, including her Ear, Nose, and Throat Specialist, her gastroenterologist, and her urologist, as well as the nurses who provide her daily care, agree with Dr. Hollingsworth's assessment that failing to provide Barbara with the one-on-one 24/7 LVN services she needs and moving her from her community home setting to a nursing home or other institutional setting would carry an extreme risk of resulting in her death.  *See* Exhibits B, C, D, E, and F.

5.      The views of Barbara's treating physicians and nurses were not a new development or surprise to HHSC.  Indeed, the plan of care submitted by Barbara's HCS provider to HHSC unequivocally demonstrates Barbara's need for 24/7 one-on-one nursing care. *See* Exhibit G.

6.      Nevertheless, despite their awareness that the medical professionals working most closely with Barbara deemed it medically necessary that she receive 24/7 one-on-one nursing care in the community, HHSC determined that it would reduce the requested funding to an amount far less than that required to provide such 24/7 nursing care.  *See* Exhibit H to this Complaint.  HHSC did so ostensibly on the basis that the cost of Barbara's care would exceed the cost cap imposed by HHSC on the HCS waiver program which funds her care.  However, HHSC never notified Plaintiff or her HCS care provider that HHSC has general revenue (GR) funds available for precisely this purpose—to supplement waiver program funds where necessary to protect the life of a disabled recipient of such funds.  These GR funds are available through a budgetary rider, attached as Exhibit I to this Complaint ("Section 23").  When determining whether the use of such GR funds is appropriate, HHSC performs its own medical evaluation on the disabled individual at issue.  However, HHSC never performed such a medical evaluation or made any determinations with respect to Barbara's medical condition, but rather

unilaterally reduced the funds it would provide to fit within its cost caps without regard to the assessments of Barbara's treating professionals that such a reduction would inevitably compromise her health and lead to an extreme risk of her resulting death.

7.      Barbara's HCS provider requested funds above the cost cap but HHSC reduced that request to an amount within the cost cap, despite the fact that only the level of funding requested by the HCS provider could protect Barbara's health and avoid the fatal consequences warned of by Barbara's treating physicians and caregiving nurses.

8.      HHSC offered Barbara a "fair hearing" with respect to its determination to reduce her requested funding which was above the cost cap (*see* Exhibit H), but made clear that it would only supply funding at the reduced level during the process leading up to that "fair hearing." Because the limited funding HHSC approved does not include GR funding, the approved funding is insufficient to provide the medically necessary care Barbara requires. Accordingly, Barbara cannot avail herself of this administrative procedure.

9.      The HCS funds HHSC intends to reduce provide community-based services and supports to individuals with intellectual and developmental disabilities to "enhance quality of life, functional independence, and health and well-being in community-based living as an alternative to institutional living."  Services available through the HCS program include private nursing services such as the services Barbara currently receives and has received from HHSC since February 2017.  As Barbara's treating physicians explain (*see* Exhibits A, B, C, and D), nursing homes and other institutional settings cannot provide the 24/7 one-on-one LVN nursing care that Barbara requires for her survival.

10.     Title II of the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12132, prohibits public entities from discriminating against qualified persons with disabilities in

providing services.  Similarly, Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794(a), prohibits recipients of federal funds from discriminating against qualified persons with disabilities.  The Supreme Court, in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999), set out three elements that show when a state agency has discriminated against a disabled person through unnecessary institutionalization.  "[T]he prohibition of discrimination may require placement of persons with mental disabilities in community settings rather than in institutions . . . when [1] the State's treatment professionals have determined that community placement is appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and [3] the placement can be reasonably accommodated, taking into account the resources available to the State and the needs of others with mental disabilities."  Consistent with this federal law, Texas state law in the form of the Persons with Mental Retardation Act (the "PMRA"), Tex. Health & Safety Code §§ 591.005 and 592.032, expressly contemplates an individual's right to receive needed services in an environment that is "the least confining for a client's condition . . . and provided in the least intrusive manner reasonably and humanely appropriate to the person's needs."

11.     In this case, HHSC has provided Barbara with group home services since February 2017 and has now, in disregard of all of the foregoing facts and legal standards, resolved to make it impossible for her group home-based services to continue.  If Barbara cannot continue to receive the one-to-one level of care she currently receives from an LVN 24/7, she will be forced to enter a nursing home or other institutional setting that does not provide this level of care.  As her treating physicians unequivocally indicate, such a determination will effectively condemn Barbara to die quickly.

12.     Because HHSC has failed to provide access to the general revenue funds medically necessary to keep Barbara alive, has failed even to provide information to Barbara and her provider concerning any procedures necessary to gain access to such GR funds, has unilaterally reduced the funding for Barbara's medically necessary HCS private duty nursing services below the level required to continue such services, and because these determinations by HHSC deprive Barbara of the ability to remain in the community, Barbara's mother, Marguerite Harrison, brings this action on Barbara's behalf, seeking to continue the funding for Barbara's group home care that is essential to her survival, and obtain declaratory relief that HHSC's denial of funding for nursing services for Barbara Harrison in her group home violates 42 U.S.C. § 12132 and 29 U.S.C. 794(a) and implementing regulations, 28 C.F.R. §§ 35.130(d) and 41.51(d).

## PARTIES

13.     Plaintiff Marguerite Harrison is the parent and natural guardian for her disabled adult child, Barbara Harrison.  Plaintiff and her daughter reside in Dallas County.

14.     Defendant Cecile Young is the Acting Executive Commission of the Texas Health and Human Services Commission. HHSC is a state agency with principal offices 4900 North Lamar Blvd., Austin, Texas 78751.  The agency and Acting Executive Commissioner Cecile Young may be served at that location.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it arises under the Constitution and laws of the United States.  Declaratory relief is authorized under 28 U.S.C. § 2201.

16.     Plaintiff's discrimination claims are brought pursuant to 42 U.S.C. § 12133, 29 U.S.C. § 794(a), and 42 U.S.C. § 1983.  Plaintiff's due process claims are brought pursuant to the Fourteenth Amendment to the United States Constitution by means of 42 U.S.C. § 1983.

17.     Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this district.

# BACKGROUND FACTS

## I.     Barbara Harrison and Her Medical Condition.

18.     Barbara, a severely disabled forty-two year old adult, has been medically diagnosed with, among other things, cerebral palsy, epilepsy, obstructive sleep apnea, severe dysphagia, gastrostomy tube dependence, scoliosis, and profound intellectual disability. Barbara is also non-verbal and non-ambulatory, making it impossible for her to communicate any of her medical needs.  Barbara is eligible for Medicaid services.

19.     On or about March 2018, Barbara experienced a decline in health. She was transported to the emergency room on three dates in April: April 17, 2018, April 19, 2018, and April 20, 2018.  Thereafter, medical professionals from Berry Family Services, Inc., a provider authorized by HHSC to provide HCS nursing services, determined Barbara required twenty-four hour care and that, in light of the complexities and risks involved, it would pose an imminent risk to Barbara's health to delegate any nursing tasks to an unlicensed professional.

20.     As explained in paragraphs 3 and 4 above, Barbara's treating physicians uniformly concur with the assessments of the medical professionals from Berry Family Services, Inc.  Dr. Terry Hollingsworth, Barbara's primary care physician, has stated unequivocally in

correspondence submitted to Defendants and attached to this Complaint as Exhibit A that (1) "Barbara requires LVN presence at all times to ensure that she does not aspirate or choke[;]" (2) "[s]uch aspiration and/or choking could potentially lead to death in minutes or could result in pneumonia which could itself be quickly fatal or could further compromise Barbara's respiratory system[;]" and (3) "moving Barbara from her community home where she currently receives LVN services 24/7 to a nursing home without 24/7 LVN services will expose Barbara to respiratory-related illness, will cause a further decline in her health and will carry an extreme risk of resulting in her death."

21.     Plaintiff's other treating physicians, including her Ear, Nose, and Throat Specialist, her gastroenterologist, and her urologist, as well as the nurses who provide her daily care, agree with Dr. Hollingsworth's assessment that failing to provide Barbara with the one-on-one 24/7 LVN services she needs and moving her from her community home setting to a nursing home or other institutional setting would carry an extreme risk of resulting in her death. *See* Exhibits B, C, D, E, and F.

22.     As further explained in paragraphs 3-6 above, Barbara can only receive the continuous one-on-one monitoring and care by licensed nurses deemed medically necessary by her treating physicians in her group home.  No nursing homes or other long term care institutions provide this level of care. Indeed, institutionalization would be fatal.

23.     Since April 2018, Barbara has received continuous one-on-one twenty-four hour care from a LVN.

## II.     The Texas Medicaid Program

24.     The Medicaid program is a joint federal and state funded program enacted to provide necessary medical assistance to needy aged or disabled persons and families with

7

dependent children, whose income and resources are insufficient to meet the cost of care.  42

U.S.C. § 1396.  States choosing to participate in the Medicaid program must operate the program

in conformity with federal statutory and regulatory requirements.  42 U.S.C. § 1396a.

25.     Each State participating in the Medicaid program must submit a Medicaid plan to

the Secretary of the United States Department of Health and Human Services for approval.  42

U.S.C. § 1396.  Each State must also designate a single-state agency to administer and/or

supervise the administration of the State's Medicaid plan.  42 U.S.C. § 1396a(a)(5).  HHSC is

the Medicaid single-state agency in Texas.

26.     Through a federally approved waiver, states have the option of covering home

and community-based services for persons who would otherwise require institutional care that

would be paid by Medicaid.  42 U.S.C. § 1396n(c)(1).  Under the waiver authority, the secretary

of HHSC may grant waivers of specified requirements such as service limitations that are

otherwise applicable to the State's Medicaid plan.  42 U.S.C. § 1396n(c)(3).  Medicaid home and

community-based waiver programs enable states to provide the level of services a person would

typically receive in an institutional setting in her or her home or some other community setting.

42 U.S.C. § 1396n(c)(1).

27.     Texas has implemented federally approved home and community-based-care

waiver programs in its Medicaid program.  HHSC operates home and community-based

Medicaid waiver programs for persons requiring either a nursing level of care or an Intermediate

Care Facility for Individuals with Intellectual Disabilities ("ICF/IID") level of care.

28.     Among other such programs, HHSC operates a federally approved home and

community-based services waiver program for Texans with intellectual or developmental

disabilities or related conditions called the HCS waiver.  This waiver provides supports and

services to Medicaid recipients with physical or mental disabilities in the home and other community-based placements through a network of HCS provider organizations.  HCS providers based on the person's individual plan of care (IPC) provide and ensure HCS recipients receive all of the supports and services necessary for their health, safety and habilitation in their least restrictive environment. For example, services available through the HCS waiver program include the private duty nursing services Barbara now receives in her group home.  In short, HCS program services are designed to ensure the individual has the opportunity to have all of their individual needs met in the community rather than in a nursing facility or other institutional long term care placement.

## III.    HHSC's Decision to Reduce Requested Funding for Services to Barbara in Her Group Home Below that Necessary for Her Survival.

29.    HHSC has provided Barbara with Medicaid-funded services in her HCS-funded group home since February 2017. Due to a decline in her health, in April 2018, she required one-on-one 24/7 care by a licensed vocational nurse (LVN).  The HCS waiver program has a Cost Cap. Barbara's IPC exceeds the HCS program cost cap because of her need for the services of an LVN 24/7. However, there are state GR funds available to pay HCS waiver program costs when individual IPC costs exceed the program's 200 percent cost cap.

30.    On or about April 23, 2018, medical professionals from Berry Family Services, Inc., a provider authorized by HHSC to provide HCS nursing services, determined that Barbara required twenty-four hour one-on-one care and that, in light of the complexities and risks involved, a licensed nurse must provide this care.  The conclusions of these professionals were submitted in an Individual Service Plan (the "ISP") to Defendants in April 2018.  The total

9

annual cost for the requested twenty-four hour care was $214,111.29. The annual cost was over the cost limit by $45,496.37.

31.     Upon receiving the April 2018 ISP, HHSC requested additional information.  On May 14, 2018, Berry Family Services professionals sent in an addendum along with documentation to justify the requested increase in nursing services.

32.     On May 29, 2018, Berry Family Services, Inc., submitted a new updated IPC over the cost ceiling and formally requested GR funds and information regarding next steps on how to seek access to such general revenue funds.

33.      Section 23 authorizes HHSC to use such general revenue funds "to pay for services if: (i) the cost of such services exceeds the individual cost limit specified in a medical assistance waiver program . . .; (ii) federal financial participation is not available to pay for such services; and (iii) the commission determines that: (a) the person's health and safety cannot be protected by the services provided within the individual cost limit established for the program; and (b) there is no other available living arrangement in which the person's health and safety can be protected at that time, as evidenced by: i) an assessment conducted by clinical staff of the commission; and ii) supporting documentation, including the person's medical and service records." *See* Ex. I.

34.     In both oral and written communications with HHSC staff, neither the Plaintiff nor Berry Family Services, Inc., received information on how to access the general revenue funds necessary to keep Barbara alive.  Instead HHSC unilaterally reduced Barbara's HCS waiver funds below the 24/7 LVN level of care necessary to ensure her survival.

## IV.  Federal and State Law Prohibit Unnecessary Institutionalization

35.     Even if a nursing home or some other institutional setting could somehow serve Barbara's many medical needs, which is demonstrably not the case, forcing Barbara to seek such services in such an institution instead of in her group home would violate the ADA, 42 U.S.C. § 12132; Section 504, 29 U.S.C. § 794(a); and the Texas PMRA, Tex. Health & Safety Code §§ 591.005 and 592.032.

36.     Title II of the ADA prohibits public entities from discriminating against qualified persons with disabilities in the delivery of services.  Section 504 prohibits recipients of federal funds from discriminating against qualified persons with disabilities.  Policies and practices that have the effect of unjustifiably segregating persons with disabilities in institutions constitute prohibited discrimination under these Acts, under the holding of *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587 (1999).

37.     Under 28 C.F.R. § 35.130(d), implementing Title II of the ADA, public entities must administer services in the most integrated setting appropriate to the needs of qualified individuals with disabilities.  This same requirement applies to recipients of federal funds under the regulations implementing Section 504 (28 C.F.R. § 41.51(d)).

38.     The purpose of the Texas PMRA is to preserve and promote the rights of individuals with mental retardation to live at home.  Tex. Health & Safety Code, §§ 591.002(d), 592.013(3).  The PMRA expressly contemplates an individual's right to receive needed services in an environment that is "least confining for a client's condition . . . and provided in the least intrusive manner reasonably and humanely appropriate to the person's needs."  *Id.* at §§ 591.005(1) and (2), 592.032.

39.     The Supreme Court, in *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 587
(1999), set out three elements that show when a state agency has discriminated against a disabled
person through unnecessary institutionalization: "[T]he prohibition of discrimination may require
placement of persons with mental disabilities in community settings rather than in institutions
. . . when [1] the State's treatment professionals have determined that community placement is
appropriate, [2] the transfer from institutional care to a less restrictive setting is not opposed by
the affected individual, and [3] the placement can be reasonably accommodated, taking into
account the resources available to the State and the needs of others with mental disabilities."

40.     Neither Barbara herself nor Marguerite Harrison, her mother, opposes Barbara's
continued care in her group home.  In fact, Marguerite Harrison actively supports such group
home care.

41.     HHSC can reasonably accommodate the provision of the necessary services to
Barbara in her group home.  Section 23 specifically allows HHSC to supplement Medicaid with
the necessary general revenue funds to care for individuals in the home.  HHSC did not base its
decision to reduce the HCS funding below that requested by Plaintiff and her provider on any
indication that funds were unavailable to care for Barbara in her group home or even on the
suggestion that Barbara's care in an institution would cost less than Barbara's care at her group
home.  Moreover, as described above, its decision flies in the face of the uniform determinations
by Barbara's treating physicians that she requires 24/7 one-on-one LVN nursing care currently
being provided in a residential community home and that is not available in any institutional
setting.

42.     Regulations implementing Title II of the ADA provide that "a public entity may
not directly or through contractual or other arrangements, utilize criteria or other methods of

administration: (i) that have the effect of subjecting qualified individuals with disabilities to discrimination on the basis of disability; [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities … ." 28 C.F.R. § 35.130(b)(3).

43.    HHSC has developed and utilized criteria and methods of administering Texas' long-term care system for persons with developmental disabilities that have the tendency and effect of subjecting the plaintiff to unnecessary and unjustified segregation on the basis of her disability by, among other things, failing to inform her of GR funding that would enable her to continue to reside in a less restrictive, more integrated setting, in violation of 42 U.S.C. § 12132 and 28 U.S.C. § 35.130(b)(3).

44.    It would not fundamentally alter HHSC's program, services, or activities to provide Barbara with the necessary GR funds to allow her to continue to live in the community.

45.    Consequently, HHSC has impermissibly discriminated against Barbara in violation of the ADA, Section 504, and the PMRA.

## V.    HHSC's Violation of Barbara's Due Process Rights

46.    Pursuant to 42 U.S.C. § 1396a(a)(3), any "State plan for medical assistance must . . . provide for granting an opportunity for a fair hearing before the State agency to any individual whose claim for medical assistance under the plan is denied or is not acted upon with reasonable promptness."  Texas has implemented this requirement with respect to HCS.  *See, e.g.*, Tex. Admin. Code §§ 353.2, 353.202, 357.3.

47.    In its responses to requests by Plaintiff and her HCS care provider for GR funding to pay for the increased costs associated with Barbara's need for LVN services, HHSC, without comment, instead reduced Barbara's request for additional funding below the requested amount

13

that would have triggered GR funds to an amount within the cost cap. In so doing, HHSC never provided Barbara or her HCS care provider with any information, written or otherwise, necessary to appeal the constructive denial of available GR funding. Indeed, HHSC did not offer Barbara an opportunity for a fair hearing or any other mechanism for review of its determination to deny GR funds. Rather, the "fair hearing" HHSC ostensibly offered required Barbara to move forward with a reduced level of funding within the HCS cost cap, but insufficient to keep Barbara alive. HHSC thus actually and constructively denied Plaintiff a fair hearing both with respect to its decision to reduce funding below the level necessary for her to survive and with respect to its failure to provide an avenue to seek access to general revenue funds.

48.     Section 23 dramatically impacts the financial and legal considerations that HHSC must use to make their determinations about the termination of HCS and other waiver services. As noted in paragraph 32 above, Section 23 provides a supplemental source of revenue if the HCS Cost Cap is exceeded and details a set of standards on which those revenues can be employed.  Because Medicaid services are terminated only if these supplemental revenues are denied, Section 23's legal standards effectively govern the termination of Medicaid services as well.  Thus, denial of supplemental funding under Section 23 must be subject to the Medicaid fair hearing requirements detailed in paragraph 42 above.

49.     This Court decided this very issue in its February 10, 2010, decision in *Knowles v. Horn*, Civ. No. 3:08-cv-1492-K, 2010 WL 517591 (N.D. Tex. Feb. 10, 2010).  There this Court held as follows: "[Section 23][1] . . . added an additional source of funding to supplement HCS funds.  This additional source of funding through state general revenue is inextricably

---

[1] The budgetary rider had a different title at the time of the *Knowles* case, but was effectively identical for applicable purposes.

intertwined with the underlying Medicaid funds.  The standards Defendants used to evaluate whether or not to deny state general revenue funds under [Section 23] therefore effectively governed whether [Plaintiff] would receive HCS funds as well.  Because the determinations made with respect to the various funding sources are inseparable, the Medicaid fair hearing requirements apply to [Section 23] state general revenue funds."  *Id*. at *6.  There is no material difference between the issue thus decided by this Court in the *Knowles* case and the due process issue in the case at hand.

## VI.    Barbara's Income and Inability to Post Bond

50.    Plaintiff's only income is $1,072.00 per month from Medicare disability.  Thus, she is unable to post bond or other security for purposes of seeking the relief requested in this Complaint.

# COUNT I:
# VIOLATIONS OF THE ADA AND SECTION 504

51.    Plaintiff incorporates by reference paragraphs 1-50 as set forth above.

52.    HHSC is a public entity within the meaning of that term under Title II of the ADA.

53.    HHSC is a recipient of federal funds within the meaning of that term under Section 504.

54.    Barbara is a qualified individual with a disability under the ADA, has a "disability" within the meaning of 29 U.S.C. § 705(9), and is otherwise a qualified individual under Section 504.

55.    Barbara's group home constitutes the most integrated, least restrictive, and least confining setting for her.

56.     HHSC's acts constitute unlawful discrimination under 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and violate the integration mandate of the regulations implementing these statutory prohibitions against discrimination, 28 C.F.R. §§ 35.130(d) and 41.51(d).

57.     HHSC's acts constitute unlawful discrimination in that it has developed and utilized criteria and methods of administering Section 23 in violation of 42 U.S.C. . § 12132 and 28 U.S.C. . § 35.130(b)(3).

58.     HHSC must interpret and apply Section 23 in a manner consistent with these federal statutes.  Its failure to do so constitutes further discrimination for purposes of these statutes.

59.     HHSC's acts will cause Barbara irreparable injury for which there is no adequate remedy at law and will further disserve the public interest.

# COUNT II:
## VIOLATION OF DUE PROCESS AND 42 U.S.C. § 1983

60.     Plaintiff incorporates by reference paragraphs 1-59 as set forth above.

61.     Barbara's eligibility for and receipt of Medicaid services creates a property right subject to due process protection under the Fourteenth Amendment to the Constitution of the United States and under Article I, § 19, of the Texas Constitution.

62.     Texas' HCS waiver program specifically provides for a fair hearing as required by 42 C.F.R. Part 431, subpart E, to Medicaid recipients who are denied waiver program services.

63.     HHSC has not provided Barbara the necessary procedural protections and have not provided her with the requisite fair hearing.

64.     By denying Plaintiff the opportunity for a fair hearing to challenge the termination of the HCS waiver services necessary to her survival and the denial of the funding that would

have allowed such services to continue, whether through the use of GR funds made available through Section 23 or otherwise, HHSC has violated the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution, Article I, § 19, of the Texas Constitution, federal Medicaid law and regulations, and the terms of Texas' HCS waiver program.

65.     HHSC is a state actor and liable for the violations of federal constitutional and statutory law pursuant to 42 U.S.C. § 1983.

66.     HHSC's acts will cause Barbara irreparable injury for which there is no adequate remedy at law and will further disserve the public interest.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following relief:

A.      That this Court assume jurisdiction of this cause;

B.      That this Court enter a declaratory judgment that

(a) HHSC's denial of the necessary funding for nursing services for Barbara Harrison in her group home violates 42 U.S.C. § 12132 and 29 U.S.C. § 794(a) and their implementing regulations, 28 C.F.R. §§ 35.130(d), and 41.51(d); and

(b) HHSC's failure to offer Plaintiff a fair hearing of which she could actually avail herself and an opportunity to appeal HHSC's decision to terminate her HCS services without such a hearing violated her due process rights;

C.      That this Court enter a preliminary and permanent injunction enjoining HHSC from denying funding for the medically necessary nursing services for Barbara Harrison  in her group home;

D.      That this Court issue a temporary restraining order, directed to HHSC, as well as HHSC's officers, agents, servants, employees, and attorneys, and any and all

persons in active concert or participation with them, restraining them from the reduction of Barbara Harrison's life-sustaining nursing services through the HCS program below the level required for her survival as indicated by her treating physicians, such temporary restraining order to remain in effect until hearing may be held on her application for preliminary injunction;

E.    That this Court set a prompt hearing on Barbara's motion for preliminary injunction restraining HHSC, as well as HHSC's officers, agents, servants, employees, and attorneys, and any and all persons in active concert or participation with them, from reducing Barbara's requested nursing services through the HCS program below the level required for her survival as indicated by her treating physicians until she is provided a fair hearing and any available administrative appeals and, should the result of that hearing and those appeals be adverse, until she has exhausted her judicial remedies;

F.    That this Court, upon final trial of this matter, make the preliminary injunction permanent;

G.    That this Court award Plaintiff her costs and fees, including reasonable attorneys' fees; and

H.    That this Court grant such additional relief as it deems equitable and just.

18

Dated:  July 2, 2018

Respectfully Submitted,

 /s/ Mark Whitburn

**Attorneys for Plaintiffs**

**Mark Whitburn**
Texas Bar No. 24042144
**Sean Pevsner**
Texas Bar No. 24079130
**Whitburn & Pevsner, PLLC**
2000 E. Lamar Blvd., Suite 600
Arlington, Texas 76006
Tel: (682) 706-3750
Fax: (682) 706-3789
mwhitburn@whitburnpevsner.com

**Garth Corbett**
Texas Bar No. 04812300
**Sean A. Jackson**
Texas Bar No. 24057550
**Disability Rights Texas**
2222 West Braker Lane
Austin, Texas 78757
Tel: (512) 454-4816
Fax: (512) 323-0902
gcorbett@disabilityrightstx.org

# VERIFICATION

THE STATE OF TEXAS §
§
COUNTY OF DALLAS §

    BEFORE ME, the undersigned Notary Public, on this day personally appeared

Marguerite Harrison, Guardian of Barbara Harrison, who, in her capacity as Guardian, after

being by me duly sworn, upon her oath stated that she has personal knowledge of the facts

concerning Barbara Harrison stated in the foregoing Plaintiff's Original Verified Complaint and

that each and every statement of fact concerning Barbara Harrison contained in that Original

Verified Complaint is true and correct.

                                    *Marguerite Harrison*

                         Marguerite Harrison, Guardian of Barbara Harrison

    SUBSCRIBED AND SWORN TO BEFORE ME on the 2nd day of July, 2018, to certify

which witness my hand and official seal.

                                    *Carolyn Roberts*

                         Notary Public in and for the State of Texas

*(Notary seal: CAROLYN ROBERTS, NOTARY PUBLIC, STATE OF TEXAS, EXPIRES 08-27-2021, ID # 1063921-3)*